# 𝔛𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## JEFFERSON STANDARD LIFE INSURANCE COMPANY v. B. M. HEDRICK.

October 11, 1943.

Record No. 2694.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Gardner L. Boothe*, for the plaintiff in error.

*Anna F. Hedrick*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Under review is a judgment in the sum of $3,000, entered on the verdict of a jury in favor of B. M. Hedrick against the appellant, in an action for deceit, to recover damages alleged to have been sustained by reason of a false representation of a material fact by an agent of the appellant relied upon as true by Hedrick.

We are asked to set aside the judgment as contrary to the law and the evidence, without evidence to support it, for errors of law in the granting and refusal of instructions and for the non-admission of a certain writing in evidence.

The material evidence is substantially without conflict.

The Jefferson Standard Life Insurance Company is a corporation, whose principal office is in Greensboro, North Carolina. Its manager in this State, Frank H. Bell, maintained an office at Richmond, Virginia. Bell was authorized to solicit loans for his company. His duty was to get completed applications and submit them to the loan committee of his company at the home office for its approval or disapproval.

Hedrick, a resident of Arlington County, Virginia, desiring a loan to construct an apartment house in Arlington county, and hearing that the appellant was desirous of making loans of its funds on such properties, asked for an interview with Bell. Bell called on Hedrick at the latter's office, and, as a result of their conference, Hedrick submitted his application for a loan in the sum of $35,000 from the company, to be secured by a first lien on the proposed building. The application was on a standard form, adopted by the appellant, and furnished to its agents. It provided that no agent could bind the company to make a

loan, and that the company could not be committed to make a loan until it had been approved by its finance committee.

On June 6, 1940, Hedrick wrote Bell calling his attention to the fact that he had not heard from him in reference to his application, and pointed out that he wished to know as soon as possible what action had been taken thereon, in view of the rising cost of materials and the probability of loss of tenants if the construction of the building was delayed.

In reply, on June 11, 1940, Bell wrote that he would be unable to have an inspection of the property made before the latter part of the week or around the middle of June, which he hoped would not then be too late, and that he would do everything possible to rush the inspection.

On June 25, 1940, Hedrick wrote Bell the inspection not having been made, and not having heard anything further in reference to his application, he would appreciate information as to what action had been taken.

On June 28, 1940, Bell advised Hedrick, in writing, that his company would not consider "a loan for more than approximately $25,000" on his property, and that if he desired a loan around that sum to let him know, and he would get his company to negotiate further.

On July 1, 1940, Hedrick acknowledged receipt of the above letter, and stated he believed he could finance his building with a loan between $25,000 and $30,000, and asked that the company send him a definite commitment, stating the amount that it would be willing to lend, the rate of interest, the cost of the loan, and the terms of repayment.

On July 3, 1940, Bell replied thanking Hedrick for reducing the amount of his application and said, "I am today completing application, and instead of sending the blue prints to you I will mail them to our Home Office in order that we may give you a definite commitment. I am sure we will have something definite within the next week."

On July 10, 1940, Bell answered the above letter as follows:

"I have everything set up in connection with your appli-cation for loan at Arlington, Virginia, and almost ready to be submitted to our loan committee, but before they will accept it it will be necessary for us to have the inspection fee of $15.00. I shall appreciate it if you will let us have your check for this amount at your earliest convenience, and if the inspection is not made this money will be refunded to you."

The next day Hedrick forwarded his personal check for $15.

On July 12th, Bell returned Hedrick's personal check by mail, stating that he had called at the latter's office during his absence on the day before, and had then received a check from Hedrick's sister for $15. He further said, "Your application for loan is now in the proper shape and I hope to have it before our Committee on next Tuesday morning, and hope to give you something definite around the middle of next week."

On July 17, 1940, Bell wrote Hedrick:

"This is to advise that your application for mortgage loan has been submitted to our Home Office, and will come before our Committee on Friday, July 19th.

"I hope to have something definite for you within the next few days."

On July 27, 1940, Hedrick wrote Bell, stating that he had not heard from the home office of the insurance company, and requested that Bell contact the home office as he was ready to begin work as soon as the final commitment was received.

No reply was received to this letter, so on August 22, 1940, Hedrick wrote Bell that he could not understand the reason for delay; that he did not wish to start his building operations until the loan was assured; and that expecting to hear daily from Bell, he had not applied elsewhere for a loan. He requested information as soon as possible because of his anxiety to complete the project before the cold weather set in.

Still receiving no reply from Bell, Hedrick, on August 28, 1940, wrote to the home office of the appellant, reciting the circumstances and requesting an immediate answer. The company replied on August 29, 1940, advising Hedrick that his mortgage loan application had not been received in the home office, and that it assumed Bell would give the matter his immediate attention, since a copy of the letter of August 28th had been sent to him.

All of the letters of Hedrick up to August 28th, 1940, were addressed to the "Jefferson Standard Life Insurance Company, Richmond, Virginia, Frank H. Bell, Manager," or to "Frank H. Bell, Manager, Jefferson Standard Life Insurance Company, Richmond, Virginia." The calling card of Bell, left with Hedrick, and the letters of Bell, written on the letterheads of the appellant, designated him as a manager of the company.

Hedrick said he attempted to telephone Bell at least ten times, and talked to him two or three times. On each occasion he was assured that he would get a reply shortly, in the next two or three days.

Hedrick did not again hear from any representative of the insurance company until September 17, 1940, on which date his building plans were returned to him, together with a personal check of F. H. Bell for $15, earmarked "Returning Inspection Fee in Connection with Application for Loan."

The return of the plans and the check was the first definite answer Hedrick received to his repeated inquiries as to what action had been taken on his application, which he had been told on July 17th, two months earlier, had been submitted to the home office of the appellant. Hedrick immediately made application to another loan company, obtained a loan commitment, and started the construction of his building about September 20, 1940.

Bell, testifying as a witness, admitted that he did not submit the application for a loan to his home office. His excuse for making the false representation was most unsatisfactory and equivocal.

Hedrick testified that when he received the letter of July 17th, stating that his application had been submitted to the insurance company, he believed it to contain the truth; that he waited, day after day and week after week, to hear one way or another what action had been taken by the company; that in reliance on that letter and on Bell's statements that he would get prompt action, he had been delayed for a period of two months in starting the construction of his building; that he lost the benefit of the summer months when construction of his type of building was less costly; and that, because of the slower wintertime construction an additional two months were required to complete the building, deferring its opening for the reception of tenants about four months altogether beyond the time when it would have been completed but for the deception of Bell.

The building was of concrete construction and had to be heated, in the course of its construction, during the winter because concrete does not set as quickly and satisfactorily in cold weather as it does in a warm temperature. Wages of carpenters, other mechanics, and laborers had risen about twenty-five cents per hour. Building materials had become scarcer and more costly, and there were consequent delays in the delivery of materials.

Hedrick, in order to retain the services of his superintendent of construction and prevent him from seeking employment elsewhere, found it necessary to pay him forty dollars a week during the months of July, August, and September, as well as during the additional two months of delay in the construction of the building. The increased cost of the building due to the higher wages of workmen and the additional pay of the superintendent amounted to $1,800. Between $500 and $600 were required for extra labor, for protection of the concrete, and for the extra time in finishing and waiting for the concrete to set and harden by reason of the winter weather. The loss of income from rentals was estimated at more than $1,000.

The evidence clearly and conclusively shows that Bell, during the negotiations for the loan from his company,

was the agent and representative of his company, acting within the scope and course of his authority; that as such agent, he made a false representation of a material fact meant to be acted on; that Hedrick, believing it to be true, delayed seeking a loan elsewhere and postponed the construction of his building; and that, Hedrick, under the circumstances and in consequence thereof, sustained substantial and definite damage.

The explanation given by Bell for his false statement does not explain. His misrepresentation is difficult to understand, except as made from a wilful and culpable desire to cover his gross neglect or to mislead. In any case, it was opposed to any sense of fair business dealing and calculated to deceive.

The gist of this action is the wilful and culpable deception of the agent, which induced Hedrick not to make application for a loan elsewhere, thereby delaying the commencement of the work upon the construction of his building. The false representation was the producing cause of the loss, the delay being a consequence and result of the statement, and, in part, a measure of the loss suffered by Hedrick.

Mr. Justice Holmes, in *National Bank, etc., Co.* v. *Petrie*, 189 U. S. 423, 23 S. Ct. 512, 47 L. Ed. 879, speaking of an action for deceit, said:

"The fraud is a tort. Its usual consequence is that, as between the parties, the one who is defrauded has a right, if possible, to be restored to his former position."

The general principle applicable here has been well stated by Mr. Justice Chinn in *Mears* v. *Accomac Banking Co.*, 160 Va. 311, 168 S. E. 740, where, summing up the rule long adopted and approved in Virginia, he said:

"The law is well settled that if one represents as true what is really false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on; and he to whom the representation is made, believing it to be true, acts on it, and in consequence thereof sustains damage, there is such fraud as will support an action

for deceit at law, or a bill for rescission of the transaction in equity. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual."

See also *Crump* v. *United States Min. Co.*, 7 Gratt. (48 Va.) 352; *Lowe* v. *Trundle*, 78 Va. 65; *Jordan* v. *Walker*, 115 Va. 109, 78 S. E. 643; *Trust Co.* v. *Fletcher*, 152 Va. 868, 148 S. E. 785, 73 A. L. R. 1111; *Union Trust Corp.* v. *Fugate*, 172 Va. 82, 200 S. E. 624; *McDaniel* v. *Hodges*, 176 Va. 519, 11 S. E. (2d) 623.

It is equally well settled in the foregoing cases of *Crump* v. *United States Min. Co., supra; Trust Co.* v. *Fletcher, supra; Union Trust Corp.* v. *Fugate, supra;* and in the following cases that a principal is liable to third persons for the negligent or wrongful acts of his agent, within the scope of his employment. *Cerriglio* v. *Pettit*, 113 Va. 533, 75 S. E. 303; *Hindman* v. *First Nat. Bank*, 50 C. C. A. 623, 112 Fed. 931, 57 L. R. A. 108; *Haskell* v. *Starbird*, 152 Mass. 117, 25 N. E. 14, 142 N. E. 695, 23 Am. St. Rep. 809.

"It is a general doctrine of law, that, * * * , he (the principal) is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. In all such cases, the rule applies, *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through instrumentality of agents. In every such case, the principal holds out his agent, as competent and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency." Story on Agency, (9th Ed.) section 452.

"The principal is also liable for the fraudulent or deceitful act of his agent committed as an incident to and

during the performance of an act which is within the scope of the agent's authority. As is said in a leading case (*Barwick* v. *English Joint Stock Bank*, L. R. 2 Ex. 259) 'no sensible distinction can be drawn between the case of fraud and the case of any other wrong.'" Mechem on Agency, (2nd Ed.) section 1984.

Counsel for the defendant, in his argument before this court, contends that the amount of the damages has not been proven with certainty. This is not a new question before this court. We have often held that one should not be allowed to escape all liability simply because the precise amount of the damages for which he is responsible is uncertain. Where the existence of a loss has been established, the quantum may be fixed when the facts and circumstances are such as to permit of an intelligent and probable estimate thereof. *Manss-Owens Co.* v. *Owens & Son*, 129 Va. 183, 105 S. E. 543; *Agostini* v. *Consolvo*, 154 Va. 203, 153 S. E. 676; *Kiser* v. *Amalgamated Clothing Workers*, 169 Va. 574, 194 S. E. 727, 114 A. L. R. 1291; and *Wyckoff Pipe, etc., Co.* v. *Saunders*, 175 Va. 512, 9 S. E. (2d) 318.

Here the loss to Hedrick was not merely uncertain and speculative. Positive and distinct damages have been established. They were such as fairly, reasonably, and naturally flowed from the wrong in the ordinary course of events. Their approximate amount was based upon the estimates of those who were qualified to pass upon the nature and extent of the damages.

Judge Prentis, later Chief Justice, in *Anchor Co.* v. *Adams*, 139 Va. 388, 124 S. E. 438, said:

"In such cases, where the damages are of such a character that no precise and definite estimation can be made, juries are allowed to act on probable and inferential proof as well as that which is direct and positive. One who is clearly liable for some damages cannot defeat a recovery merely because it is impossible to demonstrate the damages with precision."

In *Bridgewater Plow Corp.* v. *Ashby*, 159 Va. 439, 166 S. E. 472, Mr. Justice Hudgins said:

"The defendant is clearly liable for some damages, and under the circumstances the plaintiff should not be denied recovery merely because he is unable to prove with precision the grade of the missing lumber."

From what we have said, it is apparent that there was no error in granting the instructions requested by the plaintiff.

The trial court did not err in refusing to grant defendant's instruction "A." That instruction is based upon the assumption that the claim for damages was founded on contract. The claim in this case is for a tort. No contract was alleged and the authority of the agent to make the loan was not in question. The issue was the deception practiced in the course of the negotiations for the loan.

It was not error to refuse to admit in evidence a contract between the defendant and its agent to solicit applications for insurance in the State of South Carolina. The claim does not relate to an application for life insurance. It relates to the deception of an agent authorized to receive and faithfully submit to his principal applications for loans on real estate in the State of Virginia.

The defendant cites a number of cases to support his contention that a recovery is not allowed in tort for a negligent and unreasonable delay in acting upon an application for life insurance. On this question the authorities are in conflict. In a class of recent cases, the right of such a recovery has been recognized where there was a subsequent loss not covered by insurance. 15 A. L. R. 1029; 75 A. L. R. 955.

It is not necessary to enter into a discussion of this contention because, as we have heretofore said, the plaintiff in this case does not rely upon mere negligence and delay in passing on his application. He relies upon the deceit and misrepresentation of a material fact, which induced him to delay and caused him to sustain damage.

The evidence sustains the allegations of the plaintiff. The law supports his right of recovery. The jury were fully and fairly instructed, and the appellant has had a fair and impartial trial. The judgment of the trial court is affirmed.

*Affirmed.*