# ORIE L. ODEN

## v.

# CECELIA M. SALCH, ETC.

Record No. 870003

April 21, 1989

Present: All the Justices

*James A. Gorry, III (Taylor & Walker, P.C.*, on briefs), for appellant.
*Stanley E. Sacks (Sacks & Sacks*, on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

Cecelia M. Salch, co-administrator d.b.n. of the estate of Hugh J. Liverman (Salch), sued Orie L. Oden to recover damages allegedly resulting from Oden's fraudulent conversion of Liverman's assets. The case was tried to a jury, which returned a verdict in Salch's favor with damages fixed at $31,500. The trial court entered judgment in accord with the verdict, and Oden appeals.

The questions presented in this appeal are whether: (1) the action is time-barred; (2) the trial court erroneously admitted certain evidence; (3) the trial court misinstructed the jury; (4) the evidence is sufficient to support the jury's finding that Oden fraudulently converted to her own use assets belonging to Liverman; and (5) the evidence supports the damage award.

I

Because Salch prevailed at trial, we must state the evidence and all reasonable inferences deducible therefrom in the light most favorable to her. Liverman had two daughters and a son. Both daughters, Oden and Edith Marshall, lived in Norfolk. The son, Orville Liverman, lived in Pennsylvania. Relations were strained between Oden and her siblings, who believed that Oden intentionally kept them from seeing Liverman.

Shortly after his wife's death in February 1971, Liverman moved from his residence in Norfolk to Oden's residence, where he remained until his death on November 3, 1982, at age 91. From the time Liverman moved into Oden's house, Oden handled and managed all his business and financial affairs.

On April 16, 1971, approximately two months after Liverman moved to Oden's home, Liverman executed a general power of attorney designating Oden his attorney-in-fact. At that time, Liverman was in a hospital recovering from a heart attack. Liverman later stated that Oden "wanted to have power of attorney, and he let her have it." Thereafter, Oden signed all of Liverman's checks and papers.

When his wife died, Liverman and she had a joint savings account in Mutual Federal Savings and Loan Association (Mutual Federal) and another in Home Federal Savings and Loan Association (Home Federal). On the day Liverman executed the power of attorney, Oden withdrew $9,300 from the Home Federal account and immediately deposited this sum in her own account, entitled "Orie L. Oden, Trustee for Louis M. Oden, III." (Louis is Oden's son.) Three days later, Oden withdrew $7,239.82 from the Mutual Federal account, which she also deposited in her trustee account.

On May 24, 1971, Oden withdrew $17,000 from her trustee account. She did not explain what disposition was made of the $17,000. The record, too, is silent about the disposition of these funds.

Also in May 1971, Liverman closed on the sale of his Norfolk residence. He received $18,500 from the sale. As part payment on property in North Carolina that his wife had sold in 1970, Liverman was due a note payment in excess of $5,000 in December 1971.

On January 4, 1972, Oden opened a joint account with her father in Mutual Federal in the amount of $26,200. Oden closed this account on January 7, 1980. On that same day, Oden deposited $21,200 in another joint account for her father and herself. Twenty days after Liverman's death, Oden withdrew the sum of $19,841.82 from this account.

During the years 1972 through 1982, Liverman received interest from this joint account in the total amount of approximately $10,000. The interest payments were made by checks that were sent to Oden's home. During the same time period, Liverman received monthly social security checks.

Following Liverman's death, Oden reported to his executor that Liverman's only assets were a checking account with First Virginia Bank-Tidewater in the amount of $4,665.14 and a Medicare check in the sum of $610.72. After the present litigation was instituted, however, Oden "found" additional records.

Oden forwarded the newly discovered records to the executor, Wayne Tiffany,[1] under cover of the following memorandum:

---

[1] Tiffany later resigned as executor and was replaced by Cecelia M. Salch and Arthur Gerald Oden, Orie Oden's stepson.

Dear Wayne —

I have searched thru all papers etc. This is all I can find.

Daddy enjoyed what little bit he had.

And he also gave me this "To whom it may concern" in 1976. I think Dad expected this, as he told me my brother had tried to borrow some money — and Dad told him he didn't have any.

The "To whom it may concern" document referred to in Oden's memorandum is a typewritten note purportedly signed by "H. J. Liverman." The note was in an envelope on which was typed, "To whom it may concern for Orie Oden, Sunday, November 7, 1976." The note reads as follows:

To Whom it may concern.

This is to declare and to certify on this Day, Sunday November 7, 1976, I do give to my dear daughter, Orie Oden, all my savings certificates, and all personal effects I have in her home. This I give to her for the good care, all her love, time and devotion to me in these past five years in her home. For all the wonderful little things she has done to Make my life full and Happy. For the many hours she has neglected her own life in order to help me. I shall always be grateful for all the Sundays she has taken me to Church and then always along with her family. With never a cross word or unkind deed to me.

In return for all this I ask that she take care of all the details for my funeral and do as I have requested. Place me beside my beloved wife and to keep her belief in Christ.

I have been a Blessed man to have such a devoted and kind daughter. God keep her and protect her from all evil.

Signed:

This Sunday, November 7, 1976
After our Church Service.

All my Love,
/s/   H. J. Liverman

A witness who had worked in Oden's florist shop typing invoices testified that the distinctive script type on the note resembled that of the florist shop's typewriter.

Lawrence M. Farmer, an experienced documents examiner, qualified as an expert witness. Farmer opined that "the signature and the name of H. J. Liverman . . . as appears on the original document was made by someone other than Hugh J. Liverman." Before reaching this conclusion, Farmer had compared the signature on the note with "a large number of [Liverman's] signatures over a period of years." Farmer testified that "the writing in [the note] is superior to the writing ability of Hugh J. Liverman on the date that is recorded on [the note] . . . [Liverman] just couldn't write that well at [that] time."

Farmer also concluded that the "signature was placed on the document prior to the time that the typing was placed on the document[,] . . . a procedure that's often used when someone is going to create a document and utilize the signature of another person." Farmer explained that a forger must usually write the signature of the other person several times to obtain a satisfactory result. Thus, the signature will be written before a typed message is placed on the document. Consequently, the forged signature will not "line up" with the message. In this case, the signature was far left of the closing.

The records discovered by Oden also included 35 "receipts" allegedly given to Liverman by Mozell Moore over a period of approximately three years. Each receipt is for $400 in cash purportedly paid to Moore by Liverman for "Day Care." Moore worked as a maid in Oden's home. The total amount represented by the receipts is $14,000. Oden claimed that Liverman paid Moore with his money.

Farmer examined these receipts and concluded that "they were not written in accordance with the dates contained on each receipt." Farmer was of opinion that all of the receipts "were . . . written at the same time or within one sitting or two sittings."

In an apparent effort to explain in part the disappearance of Liverman's assets, Oden testified that Liverman had given $10,000 to her son, Eugene Royal. Royal, however, testified that Liverman never gave him $10,000.

## II

Oden contends that the fraud action is time-barred. She points to the fact that the alleged fraud first occurred in 1971 and continued until Liverman's death in 1982. Liverman resided in Oden's home during this entire period. Thus, she asserts, Liverman, by the exercise of due diligence, reasonably should have discovered the alleged fraud. Oden argues that the limitation period for a fraud action is one year, Code § 8.01-248, and this action was not commenced until 1985. Therefore, she says, the trial court should have sustained her statute of limitations plea.

At the conclusion of Salch's evidence, Oden moved the trial court to rule as a matter of law that the fraud action was barred by the statute. The court denied the motion, concluding that whether Liverman reasonably should have discovered the fraud was a factual issue for resolution by the jury.

We agree that the limitation period applicable to this fraud action is one year,[2] *Pigott* v. *Moran*, 231 Va. 76, 81, 341 S.E.2d 179, 182 (1986), from the time the fraud is discovered "or by the exercise of due diligence reasonably should have been discovered," Code § 8.01-249. We do not agree, however, that the trial court erred by refusing to rule as a matter of law that Liverman reasonably should have discovered the fraud. Reasonable minds could differ about whether Liverman should have discovered the fraud; thus, the court properly ruled that this was a jury issue. *See Union Trust Corporation* v. *Fugate*, 172 Va. 82, 200 S.E. 624 (1939).

Oden, however, did not request a jury instruction which would have submitted the limitation issue to the jury. Accordingly, because Oden failed to pursue her plea of the statute of limitations, we will not address the issue on appeal. Rule 5:25.

## III

Oden contends that the trial court erred in admitting Exhibits 3 and 15. Exhibit 3 is the document that has been referred to as the "To whom it may concern" note. The evidence suggests that this note was typed on Oden's business typewriter. Moreover,

---

[2] For causes of action accruing on or after July 1, 1987, however, "every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues." Code § 8.01-243(A).

Farmer, the documents expert, testified that Liverman's purported signature thereon was a forgery. The document was in Oden's possession after Liverman's death, and she presented it to his executor, representing that it was an authentic instrument. Clearly, the exhibit was relevant to the issue of Oden's fraud.

Similarly, Exhibit 15, the Mozell Moore receipts, were properly admitted. They, too, were presented to the executor by Oden after she had been sued. The purpose of the receipts was to show how Liverman spent $14,000 of his money. According to the witness Farmer, all receipts were executed at the same time — not in the regular course of business. From this evidence, the jury reasonably could infer that the entire transaction was a sham.[3]

## IV

Oden also contends that the trial court erred in granting jury instructions 4 and 9. Proposed Instruction 4, tendered by Salch, reads as follows:

> The Court instructs the Jury that under the Power of Attorney, the defendant, Orie L. Oden, as agent of Hugh J. Liverman, Deceased, was bound to exercise the utmost good faith and loyalty to her principal and was duty-bound not to act adversely to the interest of her principal by serving or acquiring any private interest of her own in antagonism or opposition thereto.

At Oden's request, the trial court amended the tendered instruction by adding thereto the following language: "while acting under the power of attorney." The court granted Instruction 4 as amended.

Instruction 9 reads as follows:

> The presumption is that people who deal with each other, grown men and women, deal with each other as such and this presumption is not destroyed by disparity in age nor by ties of blood, and this is particularly true where fraud is charged. *This presumption does not apply while acting under the power of attorney.*

---

[3] We find no merit to Oden's other evidentiary contentions. The trial court did not abuse its discretion by permitting Salch's counsel to cross-examine Oden's witness, Tiffany, or by permitting Salch's attorney to question Oden as Salch's witness.

The italicized portion of Instruction 9 was added by the trial court and is the basis of Oden's objection. (The instruction, excepting the court's amendment, had been tendered by Oden.)

We conclude that the trial court did not err in granting Instructions 4 and 9. The qualifying language added to each instruction by the court was appropriate in light of the evidence and the conflicting theories advanced by the parties.

Oden also contends that the trial court erred in granting Instruction 5. At trial, Oden's counsel stated that he objected to the instruction because he did not "believe that it's an accurate statement of law, nor that it's a proper instruction to give based on the facts of this case."

Rule 5:25 mandates that objections to a trial court's ruling must be "stated with reasonable certainty at the time of the ruling." This requirement applies to objections to the granting and refusing of instructions. Thus, when the basis of an objection is that an instruction "did not correctly state the law as applicable to the facts of [the] case," the objection "is too general to be of any assistance to the trial court and is a plain violation of the letter and spirit of Rule [5:25]." *Powell* v. *Young*, 151 Va. 985, 995-96, 144 S.E. 624, 626-27, *rev'd on other grounds*, 151 Va. 1002, 145 S.E. 731 (1928). *Accord Albert* v. *Commonwealth*, 181 Va. 894, 901, 27 S.E.2d 177, 179 (1943); *Barnes* v. *Bess*, 171 Va. 1, 10, 197 S.E. 403, 406 (1938); *Funk* v. *Commonwealth*, 163 Va. 1014, 1018, 175 S.E. 861, 862-63 (1934).

Because Oden's counsel failed to object to Instruction 5 "with reasonable certainty," we will not consider his contentions on appeal. Thus, irrespective of its correctness, concerning which we express no opinion, Instruction 5 became the law of the case. *See Commonwealth* v. *Millsaps*, 232 Va. 502, 509, 352 S.E.2d 311, 315 (1987). *See also Owens-Illinois, Inc.* v. *Thomas Baker Real Estate, Ltd.*, 237 Va. 649, 651, 379 S.E.2d 344, 346 (this day decided).

## V

Oden next contends that the evidence is insufficient as a matter of law to support the jury's verdict. She argues that Salch's case was confined to "an agency theory created by the Power of Attorney" and that the breach was of the fiduciary duty "which [Oden] owed to [Liverman] as his Attorney in Fact." Oden further asserts that Salch tried her action on the theory that the mere crea-

tion, use, and non-revocation of the power of attorney gave rise to an agency relationship that permeated every transaction between the parties.

Salch, on the other hand, claims that Oden "erroneously argues that the agency relationship that existed was created only by the power of attorney." Salch contends that "the course of dealing and the actual relationship between [Oden] and [Liverman] clearly created a relationship of principal and agent . . . in addition to the specific relationship created by the power of attorney."

A parent-child connection, standing alone, is not sufficient to give rise to a confidential or fiduciary relationship. *Nuckols* v. *Nuckols*, 228 Va. 25, 36, 320 S.E.2d 734, 740 (1984). *Cf. Carter* v. *Carter*, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982). Evidence of advice and counsel in business matters involving a certain degree of trust is necessary to show a fiduciary relationship. *Nuckols*, 228 Va. at 34, 320 S.E.2d at 739. *See Creasy* v. *Henderson*, 210 Va. 744, 173 S.E.2d 823 (1970) (fiduciary relationship found where agent acted under general power of attorney). When such a relationship exists, "any transaction to the benefit of the dominant party and to the detriment of the other is presumptively fraudulent." *Nicholson* v. *Shockey*, 192 Va. 270, 278, 64 S.E.2d 813, 817 (1951).

At trial, Oden testified that Liverman executed the power of attorney because he was ill in the hospital at the time. Although Liverman was ill only "a week [to] ten days," Oden retained the power of attorney and used it until Liverman's death. She explained her reason for doing so as follows:

Q. Well, why did you use [the power of attorney] in years after [Liverman's illness]?
A. I had to sign all of his checks, all of his papers, I signed everything for him.
   . . . .
Q. And you took care of all his affairs?
A. That's correct.
Q. And you handled all of his money?
A. That's right, at his request.
Q. And you don't have anything in writing to handle all of this money other than the power of attorney?
A. I don't think so.

It is clear, therefore, that irrespective of the source of her authority, Oden acted as Liverman's exclusive agent in handling and managing his business affairs from 1971 until his death in 1982.

We need not restate all the evidence; a partial review will suffice. On the day that Oden received the power of attorney and while Liverman was in the hospital, she used the power of attorney to withdraw $9,300 from one of Liverman's bank accounts and $7,239.82 from another of Liverman's accounts. She deposited both sums, a total of $16,539.82, in the account of "Orie L. Oden, Trustee for Louis M. Oden, III." Louis Oden, Oden's son, was a minor at the time. Approximately one month later, Oden withdrew $17,000 from the trustee account. She is unable to explain what she did with the $16,539.82 belonging to Liverman.

Additionally, following Liverman's death, Oden informed his executor that Liverman's estate consisted of a checking account in the amount of $4,665.14 and a Medicare check for $610.72. After she was sued, however, she produced the "To whom it may concern" note, which appears to be a forgery, and the questionable "receipts" from Mozell Moore that purport to account for $14,000 of Liverman's money.

When the jury received this case, it was instructed, *inter alia*, that "[t]he burden of proving fraud or conversion is on the parties charging it and either must be proven by clear and convincing evidence." The jury was further charged that it should "find [its] verdict for . . . Oden," unless "[Salch] proved [fraud or conversion] by clear and convincing evidence."

By its verdict, the jury found by clear and convincing evidence that Oden had received many benefits during the course of her fiduciary relationship with Liverman—benefits she could neither explain nor justify. We conclude that the evidence amply supports the jury's verdict.

## VI

Oden also contends that the evidence is insufficient as a matter of law to support the damage award. She asserts that "[t]here is not the first shred of evidence to support the award," and that it is based upon "the grossest speculation."

Damages must be proved with reasonable, but not absolute, certainty. *Gwaltney v. Reed*, 196 Va. 505, 507-08, 84 S.E.2d 501, 502 (1954). Ordinarily, a determination of the quantum of damages is a jury issue. *Medcom, Inc. v. C. Arthur Weaver Co.,*

232 Va. 80, 87, 348 S.E.2d 243, 248 (1986). The jury's award, however, must be based upon evidence and not left to speculation. *Id.* Because absolute certainty is often unattainable, it is proper to place before the jury "all the facts and circumstances of the case having any tendency to show damages, or their probable amount, so as to enable [the jury] to make the most intelligible and probable estimate which the nature of the case will admit." *Southern Railway Co.* v. *McMenamin*, 113 Va. 121, 129, 73 S.E. 980, 982 (1912). *Accord Nat. Energy Corp.* v. *O'Quinn*, 223 Va. 83, 90, 286 S.E.2d 181, 185 (1982).

As previously noted, Oden used the power of attorney to withdraw $16,539.82 from Liverman's accounts, which she deposited in her account as trustee for her infant son. Approximately one month later, she withdrew the money from her trustee account without further explanation. She presented questionable receipts purporting to account for $14,000. She also claimed that Liverman gave $10,000 to another son — a claim the son denied.

This evidence alone reasonably could have formed the basis for the jury's damage award. Accordingly, we hold that the evidence is sufficient to support the jury's award of damages.

## VII

For the reasons stated, we will affirm the trial court's judgment.

*Affirmed.*